# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person*<br>*by name and address)*<br>The accounts and information associated with<br>**rjackson@zjinv.com** and **rjackson@ttninv.com** that<br>are in the possession of EStreet Communications whose<br>office is located at 96 Inverness Dr E Ste G. Englewood,<br>CO 80112, from the time period of October 13, 2016 to<br>the date of information is collected pursuant to this<br>warrant, more fully described in Attachment A, attached<br>hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  17-sw-5659-NYW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

SEE "ATTACHMENT A", which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE "ATTACHMENT B", which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    **X** evidence of a crime;

    **X** contraband, fruits of crime, or other items illegally possessed;

    **X** property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of <u>16</u> U.S.C. §§ <u>1538, 3771, and 4223</u> and <u>18</u> U.S.C. §§ <u>371 and 545</u> and the application is based on these facts:

    **X** Continued on the attached affidavit, which is incorporated by reference.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*s/Anne-Marie Sharkey*_____
*Applicant's signature*

<u>Anne-Marie Sharkey, Special Agent, U.S. Fish and Wildlife Service</u>
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
               X submitted, attested to, and acknowledged by reliable electronic means.

Date: **16 May 2017**

City and state: ___Denver, CO___

_____
*Judge's signature*

*HON. NINA Y. WANG, USMJ*

## <u>ATTACHMENT A</u>

### DESCRIPTION OF LOCATION TO BE SEARCHED

Information associated with the e-mail accounts known as:

**rjackson@zjinv.com**
**rjackson@ttninv.com**

and to include information about other EStreet communications services associated with that account including Albums, cookies, pixel tags, and Web History (hereinafter and in Attachment B "SUBJECT ACCOUNT") which is in the possession of or under the control of the e-mail and Internet Service Provider EStreet Communications whose office is located at 96 Inverness Dr E Ste G. Englewood, CO 80112, (hereinafter and in Attachment B "PROVIDER.")

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Pursuant to 18 U.S.C. § 2703, PROVIDER, as described in ATTACHMENT A, is hereby ordered as follows:

### I.   SEARCH PROCEDURE

a.      The search will be presented to personnel of the PROVIDER, who will be directed to isolate those accounts and files described in Section II below regardless of whether such information is stored, held, or maintained inside or outside of the United States.

b.      In order to minimize any disruption of computer services to innocent third parties, the PROVIDER's employees and or law enforcement personnel trained in the operation of computers, will create an exact duplicate of the account and file described in Section II below, including an exact duplicate of all information stored in the account and files described therein

c.      The PROVIDER's employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

d.      Law enforcement personnel will thereafter review all information and records received from PROVIDER's employees to determine the information to be seized by law enforcement personnel specified in Section III.

### II.   INFORMATION TO BE DISCLOSED BY PROVIDER

a.      For the SUBJECT ACCOUNTS listed in Attachment A **for the time period from October 13, 2016 to the date the PROVIDER collects the data in response to this order** the PROVIDER shall disclose the following information, and the disclosure shall include all information even if deleted yet still available to the PROVIDER, and all information preserved pursuant to a request under 18 U.S.C. § 2703(f):

1.      The contents of all emails and attachments associated with the SUBJECT ACCOUNTS, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) emails sent to and from the account, draft emails, existing printouts of any such emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

2.      All records or other information regarding the identification of the SUBJECT ACCOUNTS, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative or recovery email addresses, phone numbers,

34

or other identifying information provided during registration, other associated Google accounts, all screen names associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

       3.     Identity of other accounts or services sharing the recovery account or telephone number or other two-factor authentication methods used for the SUBJECT ACCOUNTS and the services the SUBJECT ACCOUNTS used and all records generated by those services;

       4.     All records indicating the services available to subscribers of the SUBJECT ACCOUNTS;

       5.     All records or other information stored at any time by an individual using the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, and files;

       6.     All information about the device or devices used to access or use the SUBJECT ACCOUNTS;

       7.     All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

       8.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

### III.    INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

      a.     All information described above in Section II that constitutes fruits, evidence and instrumentalities of crimes involving wildlife trafficking, including violations of the Lacey Act (16 U.S.C § 3771), the Endangered Species Act, (16 U.S.C. § 1538), the Elephant Conservation Act,( 16 U.S.S. § 4223), conspiracy (18 U.S.C. § 371) and, smuggling (18 U.S.C. §545)

       1.     All electronic mail, attachments, and related computer files that identify the account user, individuals, or correspondents, or that identifies the means or methods used for wildlife trafficking, unlawful importation, smuggling, or other violations of  Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

       2.     All electronic mail, attachments, and related computer files that evidences or identifies means of payment relating to wildlife trafficking, the unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

3.      All "address books" or other lists of correspondents that identifies individuals or correspondents involved in wildlife trafficking, unlawful importation, smuggling, or other violations of  Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

4.      All saved "chats" or other communications that identify wildlife trafficking, unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

5.      Any and all records, documents, visual depictions, and materials pertaining to wildlife trafficking, unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

6.      Any and all information, notes,  documents, records, or correspondence, in any form and medium pertaining to wildlife trafficking, unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545, or that may be helpful in identifying any such c;

7.      Images, correspondence, and other records that help identify the users of the SUBJECT ACCOUNTS.

8.      Location information associated with the SUBJECT ACCOUNTS that may help show where and who is involved in wildlife trafficking, unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545;

9.      Information about the devices used to access the SUBJECT ACCOUNTS that is evidence of or identifies persons involved in wildlife trafficking, the unlawful importation, smuggling, or other violations of Title 16 U.S.C. §§ 3771, 1538, 4223 or Title 18, United States Code § 371 and 545

10.      Records relating to who created, used, or communicated with the SUBJECT ACCOUNTS or identifiers, including records about their identities and whereabouts.

## AFFIDAVIT

I, Anne-Marie Sharkey, Special Agent with the United States Fish and Wildlife Service, Office of Law Enforcement ("FWS-OLE"), being duly sworn, deposes and says that:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Department of Interior U.S. Fish and Wildlife Service, Office of Law Enforcement ("FWS-OLE"). I have been a federal law enforcement officer and agent from 2007-2016 with the Department of Interior Bureau of Land Management and a SA with FWS-OLE since May 2016. I am currently assigned to investigate wildlife crimes including the involvement of illegal importation and transportation of wildlife. During my tenure as a federal law enforcement officer, I have assisted in investigating a variety of natural resource criminal investigations. During the course of these investigations, I have interviewed witnesses, conducted physical surveillance, executed search warrants, reviewed financial records, business records, and have retrieved and analyzed database information from incident management analysis and reporting systems from both the BLM (IMARS) and FWS-OLE (LEMIS). Through my training, education, and experience, I am familiar with the techniques and methods used by individuals involved in criminal natural resource crimes.

2.      Among other duties, I am currently participating in an investigation relating to allegations that PAUL ROSS JACKSON, DANA NICOLE JACKSON, HANNO VAN RENSBURG, WINNIE DA COSTA, ANDY HUNTER, DENISE CRICHTON, and ROBERT and ROSELLA QUARTARONE are committing violations of the crimes listed below in paragraph 3. Specifically, the investigation is focused on an effort by these individuals to smuggle into the country a hunting trophy comprising sport-hunted African elephant ivory from Zimbabwe.

3.      This affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the email account described in Attachment A (hereinafter "SUBJECT ACCOUNTS") and all content found therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of crimes involving wildlife trafficking, including violations of the Lacey Act (16 U.S.C § 3771), the Endangered Species Act, (16 U.S.C. § 1538), the Elephant Conservation Act,( 16 U.S.S. § 4223), conspiracy (18 U.S.C. § 371), smuggling (18 U.S.C. §545), and wire fraud (18 U.S.C. § 1343).

4.      I have personally participated in the investigation, which is described in more detail below. My familiarity with the investigation is also based on conversations with other law enforcement personnel and my review of reports and documents provided to me by other law enforcement personnel. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Furthermore, unless otherwise noted, the conversations and documents in this Affidavit are set forth in sum and substance only. Where documents and communications are quoted, I have not fixed typographical and other errors, unless necessary to aid in clarity. Because the purpose of this affidavit is limited to setting forth probable cause to search the

SUBJECT ACCOUNTS I have not set forth all of the facts of which I am aware concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of crimes involving wildlife trafficking, including violations of the Lacey Act (16 U.S.C § 3771), the Endangered Species Act, (16 U.S.C. § 1538), the Elephant Conservation Act,(16 U.S.S. § 4223), conspiracy (18 U.S.C. § 371), and smuggling (18 U.S.C. §545).

5.       This is the third application for a warrant to search the SUBJECT ACCOUNTS. On October 13, 2016 the Honorable Michael J. Watanabe issued a search warrant pursuant to Federal Rule of Criminal Procedure 41(c) and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)A) for the email addresses info@specialtyimporters.com and rosella@specialtyimporters.com.  That warrant was returned by Google on October 31, 2016.

## BACKGROUND:  CRIMES RELATED TO WILDLIFE TRAFFICKING

6.       The Lacey Act, amended many times since its enactment in 1900, is codified at 16 U.S.C. §§ 3371-78.  It contains criminal prohibitions against, among other things, (1) importing wildlife that was hunted or transported in violation of state, federal, American Indian tribal, or foreign laws or regulations relating to fish and wildlife; and (2) falsely labelling shipments of fish and wildlife travelling in interstate commerce.

7.       The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), was signed by the United States in 1973 and became effective in 1975. CITES, March 3, 27 U.S.T. 1087, 993 U.N.T.S. 243.  CITES regulate the international trade in wildlife by placing species onto three "Appendices" based on the species' relative threatened status:  species on Appendix One are the most seriously threatened and, therefore the most restricted; species on Appendix Two are not as threatened and can be traded with an appropriate permit; species on Appendix Three are those that are of concern only in a particular country and are the least regulated.

8.       The Endangered Species Act ("ESA"), codified at 16 U.S.C. § 1531-1544, executed the CITES by establishing a program for the conservation of endangered and threatened species, designated as such by the Secretaries of the Interior and Commerce.  The ESA contains criminal prohibitions against, among other things, violating a regulation issued by the Secretary of the Interior, who exercises his authority through the Service.

9.       The African elephant (*Loxodonta Africana)* is listed as "threatened" under the ESA.  Accordingly, it is subject to regulations promulgated by the Secretary of the Interior.  One of those regulations, found at 50 C.F.R § 17.40 (e), includes specific requirements for importing sport-hunted trophies.  Under Paragraph 17.40 (e)(3)(iii)(C), in order for the Service to authorize the import of a sport-hunted elephant trophy, the Service must find that the killing of the animal whose trophy is intended for import would enhance the survival of the species in the wild.

10.     On July 17, 2014, the Service determined that the import of sport-hunted African elephant trophies taken in Zimbabwe on or after April 4, 2014, until present will not be allowed. The decision to suspend importation of African elephant trophies taken in Zimbabwe was based

on the Service's inability to determine whether the killing of the animal whose trophy is intended for the import into the United States would enhance the survival of the species in the wild.  *See* 79 Fed. Reg. 44459-61.

11.     On March 26, 2015, the Service extended the ban on the import of sport-hunted African elephant trophies into 2015 and to all future hunting seasons until the Service can obtain necessary information about the status of Zimbabwe's elephant population.

12.     The suspension does not prohibit U.S. hunters from traveling to Zimbabwe to hunt elephants.  Instead, it prohibits importing the corresponding elephant trophies taken during such hunts, without authorization from the Service.

13.     The African Elephant Conservation Act of 1988, codified at 16 U.S.C. § 4201 *et seq.*, amended the Endangered Species Act by supplementing and strengthening the CITES as it pertains to African elephants.  Specifically, 16 U.S.C. § 4223 makes it unlawful to (1) import raw African elephant ivory from any country other than one that is designated as an "ivory producing country," (2) export raw African elephant ivory from the United States; (3) import raw or worked African elephant ivory from an "ivory producing country" that was exported in violation of the "ivory producing country's laws" or CITES; and (4) to import raw or worked African elephant ivory from a country on which a moratorium has been imposed by the Secretary of the Interior.

14.     The Federal smuggling statute, codified at 18 U.S.C. § 545, makes it a crime to, among other things, (1) knowingly and willfully, with the intent to defraud the United States, smuggle merchandise that must be invoiced, or to pass a false, forged or fraudulent invoice or other document or paper; and (2) knowingly import or bring into the United States any merchandise contrary to law.  As explained above, relevant regulations prohibit the importation of sport-hunted African elephant trophies from Zimbabwe.

15.     The Federal wire fraud statute, codified at 18 U.S. Code § 1343, makes it illegal to devise or intend to devise any scheme or artifice to defraud, or obtain money by means of false or fraudulent pretenses; transmits or causes to be transmitted by means of wire communication in interstate or foreign commerce any writings, signs, signals, pictures, or signs for the purpose of executing such scheme or article.

16.     Finally, the general conspiracy statute, codified at 18 U.S.C.§ 371 generally prohibits any agreement between two or more people, consummated with one or more overt acts, to either defraud the United States, or to commit any offense against the United States, including the offenses described above.

## BACKGROUND:  THE INTERNET

17.     As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless

transmissions, including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.   Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("email").  An individual who wants to use Internet email must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).  Once the individual has accessed the Internet, that individual can use an email account provided by their ISP or they can use the Internet to connect to web-based email services (such as those provided by Google, Yahoo and Microsoft) to send and receive email.  Web-based email services provide email accounts that may be accessed from any computer that has access to the Internet.  In addition, the individual can access websites using web browsers (computer programs that permit users to navigate through pages of information that are stored on remote computers, such as Microsoft's Internet Explorer and Mozilla's Firefox) to view or download content, or make purchases.   The Internet may also be used to access e-groups (websites that require users to subscribe, and permit subscribers to post messages, chat electronically, post and transfer files and share information), newsgroups (that permit posting of email messages regarding specific topics) and video conferencing.

18.     **E Street Communications. ("Provider" or "online service")**

a.   In my training, experience, and research, I have learned EStreet Communications (hereinafter "Provider" or "online service") provides a variety of online services, including e-mail.  Subscribers obtain an account by registering with the Provider.  During the registration process, the Provider asks subscribers to provide basic personal information such as name, address, phone number, e-mail address, IP address, browser type, and computer information. The computers of the Provider are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for the Provider subscribers) and information concerning subscribers and their use of the Provider services, such as account access information, e-mail transaction information, account applications, and information about any services the Provider keeps such as information about map searching, internet searches, profile information, and more.

b.   In general, an e-mail that is sent to the Provider subscriber is stored in the subscriber's "mail box" on the Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider.  If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers indefinitely.

c.   When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the Provider's servers, and then transmitted to its end destination. The Provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the e-mail can remain on the system indefinitely.

d.   The Provider's subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by the Provider.

e.   When subscribers sign up for an e-mail account with E Street Communications, they can also sign up for Cloud integration; LAN, WAN connectivity and planning; offsite backups, and productivity web apps.  Google discusses the services it offers and explains to its customers and potential customers about the information it collects from the use of those services in its privacy policy. That privacy policy is available online at https://http://www.estreet.com/horse/4H-HorseFlyer2011.pdf.  I visited that website on February 22, 2017, and read about the services E Street communications provides and the information it collects.  I have provided E Street communications policies into this affidavit by reference rather than repeating here, all of the services and information it collects in the amount of detail that policy sets forth. However, a few examples are as follows:

- E Street communications collects information about the subscriber such as personal information, name, address, email address, telephone number, IP address, browser type, computer information or any other personal information.  E Street communications gathers information about the devices a subscriber uses, and identifying information about those devices as well as information about how the user interacts with E street communications services.

- E Street communications uses services, which may utilize cookies. Cookies are small pieces of code that E street services install on a customer's device or browser when a user visits a website. Those cookies allow E Street communications to partner services to link a customer's Internet usage in order to make access more convenient for clients.

19.  **Internet Service Providers ("ISP")**

a.      ISPs are commercial organizations that are in business to provide individual and business access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, wireless or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports.

b.      Many ISPs assign each subscriber an account name – a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  ISPs maintain records pertaining to their subscribers, regardless of whether those subscribers are individuals or entities.  These records may include account application information, subscriber

and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Such temporary, incidental storage is defined by statute as "electronic storage," and the provider of such a service is an "electronic communications service." A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service."

20.     Internet Protocol Address ("IP Address"): Every computer or device on the Internet is referenced by a unique Internet Protocol address. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual access the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Some ISPs employ static IP addressing where one IP address is assigned permanently to a given user or a computer on a network.

21.     A host computer is one that is attached to a dedicated network and serves many users. These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems. These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

22.     Some of these systems offer their subscribers the ability to communicate publicly or privately with each other in real time in the form of "chat rooms" or using applications that allow direct chat between users. Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant or other messages.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT THERE IS A CONSPIRACY TO SMUGGLE AN AFRICAN ELEPHANT TROPHY FROM ZIMBABWE TO SOUTH AFRICA AND FROM SOUTH AFRICA INTO THE UNITED STATES

23.     PAUL ROSS JACKSON resides in Evergreen, Colorado, within the State and District of Colorado, with his wife, DANA NICOLE JACKSON. Unless otherwise specified, references to "JACKSON" in this affidavit are references to PAUL ROSS JACKSON. JACKSON maintains a business and warehouse in Golden, Colorado. I believe that JACKSON uses the email address rjackson@zjinv.com and the account rjackson@ttninv.com. The rjackson@zjinv.com account was provided to a Cooperating Private Individual ("CPI") by JACKSON and has been used by the CPI to successfully communicate with him. I believe that

the rjackson@ttninv.com is used by JACKSON because JACKSON provided a business card to the CPI listing this email address as a way to communicate with him, (2) the CPI has used this email address to communicate with JACKSON and (3) the content of emails sent to and from the rjackson@ttninv.com and the safarispecialityimporters.com accounts are consistent with information, set forth below, relayed by JACKSON to the CPI and to FWS-OLE Special Agent Meyers, who was acting in an undercover capacity.[1] When describing emails sent to and from these accounts, I will refer to them as emails sent to and from PAUL ROSS JACKSON.

24.     Based on the evidence set forth below, I believe that PAUL ROSS JACKSON, in the spring of 2015, killed a bull African elephant in Gonarezhou National Park in Zimbabwe (the "Spring 2015 Elephant Hunt").  I further believe that JACKSON directed or directed the attempt to get an affidavit to present to the Zimbabwe authorities claiming he was a resident of South Africa for the purpose of obtaining a CITES permit allowing him to import that elephant's ivory tusks from Zimbabwe to South Africa.  Finally, I believe that JACKSON intends store the ivory with WINNIE DA CASTA in order to smuggle the elephant and its tusks into the United States or gain proceeds by illegally selling the ivory.

25.     Based on evidence acquired during this investigation, I believe that several individuals are conspiring with PAUL ROSS JACKSON to facilitate and coordinate the smuggling of the African elephant ivory trophy:

a.     The facilitator of PAUL ROSS JACKSON's imports is SAFARI SPECIALTY IMPORTERS, based out of Pine Bush, New York.  A facilitator arranges all aspects of the import of the shipment by working with the foreign exporter, professional hunter, taxidermist, broker, transportation companies (both foreign and domestic).  The facilitator is also in charge of securing payment from JACKSON to cover all of these costs.  New York Department of State records list ROBERT QUARTARONE as the Chief Executive Officer and Principal Executive Officer of SAFARI SPECIALTY IMPORTERS.  His wife, ROSELLA QUARTARONE is an employee of the company.  Unless otherwise specified references to "QUARTARONE" in this affidavit are references to ROSELLA QUARTARONE.  TARA MOGHADDAM is also an employee of the company.  I believe that ROSELLA QUARTARONE and TARA MOGHADDAM jointly used the email address info@safarispecialtyimporters.com until MOGHADDAM quit her job on or about July 24, 2016.  I believe this because (1) a cooperating private individual ("CPI") received this address from JACKSON, who had provided it to the CPI, as a way to contact "Rosella," (2) emails within this account show that individuals referring to themselves as "Tara" and "Rosella" write and receive emails from this account, and (3) the content of the emails is consistent with other information gathered during the investigation relating to the Spring 2015 Elephant Hunt.  After MOGHADDAM quit working for SSI, I believe that the info@safarispecialityimporters.com account was used exclusively by QUARTARONE.  I believe that QUARTARONE is the sole user of the address "rosella@safarispecialtyimporters.com," because (1) my review shows that the only individual using this account refers to herself as "Rosella" and is referred to that way by

---

[1] Unless otherwise specified, all of the communications sent and received by Special Agent Ed Meyers were sent and received pursuant to Special Agent Meyer's use of an undercover identity.

others and (2) the address is used for business and employment matters relating to SAFARI SPECIALTY IMPORTERS. When describing emails sent to and from the info@safarispecialtyimporters.com account, I will refer to the individual identified as the sender or receiver (i.e., ROSELLA QUARTARONE or TARA MOGHADDAM) or, when no individual is identified, I will identify the emails as being sent to or from SAFARI SPECIALTY IMPORTERS.

        b.      HANNO VAN RENSBURG is a professional hunter based in South Africa. He operates using the business AUTHENTIC AFRICAN ADVENTURES. I believe that VAN RENSBURG uses the email account hanno@baltimore.co.za because (1) this is the address that VAN RENSBURG listed in promotional materials and on a business card that he provided to Special Agent Meyers, (2) the individual sending and receiving this email refers to himself as "Hanno," and (3) the content to the emails is consistent with information, gathered during the investigation, known to VAN RENSBURG. I also believe that VAN RENSBURG used the account hanno@onnahgroup.co.za. As set forth below, that email was used by other individuals to reach VAN RENSBURG and a person responded from that email address using a signature block with the "Hanno Van Rensburg," as well as details about AUTHENTIC AFRICAN ADVENTURES, including its PO BOX and telephone numbers. When describing emails sent to and from these accounts, I will refer to them as communications to and from HANNO VAN RENSBURG.

        c.      WINNIE DA COSTA is a taxidermist based in South Africa operating through the business KWIKTAN TAXIDERMY now doing business as WINDOWS OF AFRICA. I believe DA COSTA uses the email account winnie@kwiktan.com, Winnie@windowofafrica.co.za, and winnied333@gmail.com because (1) the CPI successfully communicated with DA COSTA at one of the addresses in the past, (2) Special Agent Meyers has communicated with DA COSTA one of the addresses, (3) two of the addresses are used on the website for KWIKTAN, and (4) prior search warrant material shows DA COSTA communicating by all three listed accounts. When describing emails sent to and from the winnie@kwiktan.com, Winnie@windowofafrica.co.za, and winnie333@gmail.com addresses, I will refer to them as communications to and from DA COSTA.

        d.      DENISE CRICHTON is an employee of SPHERICAL FREIGHT, a Zimbabwe-based exporter. I believe that info@sphericalfreight.co.za account is used by DENISE CRICHTON because (1) that is the name QUARTARONE has associated with that address in the specialtyimporters.com account, (2) the person responding to emails sent to this address refers to herself as "Denise." When describing emails sent to and from the info@sphericalfreight.co.za address, I will refer to them as communications sent to and from CRICHTON.

        e.      ANDY HUNTER is a professional hunter based in Zimbabwe who operates through the business CHIPITANI SAFARI COMPANY. I believe that he uses the email address chipitani@zol.co.zw because (1) that is the name SAFARI SPECIALTY IMPORTERS has associated with that address in the info@safarispecialtyimporters.com account, (2) this is also the address listed on the internet, at www.alaska.net/~chuck/homepage.html, as a way to contact "Andy Hunter-Professional

Hunter," (3) the content of the emails indicates that HUNTER is, indeed, a professional hunter based in Harare, Zimbabwe who has a business relationship with JACKSON and QUARTARONE, and (4) I have personally communicated with HUNTER using this email address.

26.     Flight records show that PAUL ROSS JACKSON flew from Denver to Johannesburg, South Africa, on April 22, 2015. He returned on flights taking place between May 6 and May 7, 2015.  Before he left, ROSELLA QUARTARONE wrote to JAPIE NEL, copying HANNO VAN RENSBURG at the hanno@baltimore.co.za email account, and ANDY HUNTER.  NEL later identified himself as being associated with SERENGETI SAFARIS, a Zimbabwe-based company.  QUARTARONE identified herself as the "Personal Importer for our friend and client Mr. Jackson" and noted that she operated under his "power of attorney."  She then provided JACKSON's address in Evergreen Colorado and his passport number for use in the "hunting register."  Finally, she identified "Mr. Andy Hunter" for "dip/pack/shipping."  A person identifying himself as JAPIE NEL responded the next day to confirm, "Mr. Jackson booked an Elephant Bull /plains game hunt."  NEL also explained that "there is a ban on importing elephant to US by Fish and Wildlife in the US" and that "Mr. Andy Hunter handles all of the taxidermy for Serengeti Safaris."  In a subsequent email, TARA MOGHADDAM informed HUNTER that JACKSON "will be having all of his trophies go to KWIKTAN in SA."

27.     On June 22, 2015, PAUL ROSS JACKSON texted a Cooperating Private Individual ("CPI") a photograph depicting himself with a dead elephant while holding his firearm:



The man standing second from the left is JACKSON.

28.     On or about July 25, 2015, PAUL ROSS JACKSON came by the CPI's place of business.  The CPI voluntarily made a digital audio recording of the resulting conversation:

a.    JACKSON stated he killed the photographed elephant in Gonarezhou National Park in Zimbabwe.  He further bragged that it was a "ninety-six (96) pound elephant."  I know, from my training and experience, that this is a reference to the weight of the elephant's tusks, which is the way that hunters measure their elephant trophies.

b.    JACKSON went on to state that he had paid the Zimbabwe government game scout (the man standing to JACKSON's right in the photograph) five thousand dollars to be able to hunt the park.

c.    JACKSON stated he was guided on this hunt by HANNO VAN RENSBURG.

d.    JACKSON further explained VAN RENSBURG had driven to Zimbabwe to retrieve the ivory from the elephant and VAN RENSBURG was in the process of transporting it from Zimbabwe to South Africa.  There, WINNIE DA COSTA of KWIKTAN TAXIDERMY would falsely certify that the elephant was from South Africa and not from Zimbabwe.

29.    On July 28, 2015, acting in an undercover capacity, FWS-OLE Special Agent Ed Meyers was introduced to PAUL ROSS JACKSON by the CPI.  Special Agent Meyers made a digital audio recording of the contact with JACKSON:[2]

a.    During the conversation, JACKSON showed Special Agent Meyers a digital photograph, stored on JACKSON's cellular telephone, of the elephant he killed in May 2015 in Gonarezhou National Park in Zimbabwe.

b.    JACKSON identified HANNO VAN RENSBURG as the Professional Hunter (PH) that he hires when hunting in Zimbabwe and described VAN RENSBURG as *"part of the family."*

c.    JACKSON informed Special Agent Meyers that his elephant taxidermy work is done by WINNIE DA COSTA of KWIKTAN TAXIDERMY and the import is handled by ROSELLA QUARTARONE of SAFARI SPECIALTY IMPORTERS.

d.    JACKSON described to Special Agent Meyers how he was going to bring his elephant from Zimbabwe back to the United States. JACKSON replied:

> My deal is, I'll get my elephant in this way, I have my taxidermy work done in, uh, Johannesburg, then shipped to me, and the lady is 20 percent of the cost of the United States.  Additional 10 percent for shipping, so I'm getting it for, if I pay 10, it's even less than that, my lions, $300 in shipping and $900 fully life sized mounted on rolling habitat with wood side, yeah, and museum quality.  She does the museum work on the African continent.

---

[2] Quotations from recorded telephone calls set forth in this affidavit have been lightly edited to remove pauses, stutters and other verbal breaks.

Special Agent Meyers asked who he was talking about.  JACKSON responded:

> It's, uh, Winnie Da Costa – Winds of Africa or something like that,
> I don't know what it is now – Wind of Africa, and then Rosella
> with SSI[3] brings my stuff over.  She (inaudible) in touch with all
> that stuff.  If you like getting on the phone with all those people,
> that's your game, that's fine, I don't. . . .  I go hunt, I give them my
> business card and I say here call this lady, I'm done, I'm on to the
> next deal.

e.   Later on in the conversation, JACKSON expressed his frustration with United
States regulations regarding sport-hunted elephants:

> Well, you can't.  It's Zim ivory.  You know, I mean, it's stamped.
> So, I'll bring, I'll sell my elephant to a guy in Germany who shot
> one in Namibia.  So I can get his skin and then he's buying — I'm
> buying his.  So now I got a Namibian elephant that's a curio
> elephant.  Ok.  Same size.  Pretty much same size.  You know,
> you're in Chilojo [an area in Zimbabwe], you know you're getting
> immigrant Botswana elephants.  So on the strip, you're getting the
> same thing.  The tusk length, I mean the trunk length, is three
> inches different.  Mine was three inches longer.  He's happy.  And
> so I get his, it's going to be certified Namibian.  He's getting mine.
> And Winnie's going to slip the fake tusks in there and I'm gonna
> sell the ivory to the Chinese.  So now I'm an ivory salesman.  And
> $300 a pound.  And I've got 400 pounds over there.  It's $120,000.
> And the government's making me do this.  If they let me bring my
> ivory back here, I'm not going to sell it to the Chinese.

f.   JACKSON's conversation with Special Agent Meyers shows JACKSON is aware
of the relevant rules and regulations regarding the importation of sport-hunted African elephant
ivory trophies.  JACKSON stated during the conversation he planned to have his elephant
shipped using fake tusks made from casts of the original ivory tusks.  Furthermore, several
emails from JACKSON, on which SAFARI SPECIALTY IMPORTERS was included, indicate
JACKSON has, in fact, taken steps to make casts of the original ivory tusks.  However, as set
forth below, conversations between Special Agent Meyers and HANNO VAN RENSBURG
reveal an active effort to smuggle the hunted elephant ivory into the United States, which is
corroborated by other email correspondence.  In addition, it is my experience hunters rarely give
up their trophies.  A hunter's trophy is a status symbol used by a hunter to display their success
and prowess to other hunters.  Often, a hunter's driving purpose is to kill a "trophy class animal"
so they can display to others (as exemplified below by VAN RENSBURG's descriptions of
JACKSON's pursuit of a "hundred pound elephant").

---

[3] Based on the facts known to me in this investigation, I believe this is a reference to
Safari Specialty Importers.

30.    Emails sent between TARA MOGHADDAM and ANDY HUNTER further corroborates the information obtained by Special Agent Meyers.  On June 3, 2015 HUNTER responded to TARA's require for an update on the statute of PAUL ROSS JACKSON's trophies:

> I have been to collect his trophies which included : 1 skull, 1 cape, 3 panels skin, 4 feet, and 4 bones..  There appears to be an issue with the ivory (which have not yet been registered) and these are being held by National Parks as apparently the bull was killed within a National Park?? I don't know any details but I am concerned.
>
> Regard,
>
> Andy

TARA MOGHADDAM forwarded this email to JACKSON that same day, copying the email address nicolednj@comcast.net (I believe this to be the address used by DANA NICOLE JACKSON).  TARA also wrote, among other things:

> Please see the below email I received from the dip/packer in Zimbabwe…he was able to pick up the highlighted items but not the ivory due to the elephant being killed in a National Park.
>
> I have copied Hanno as he needs to sort this out asap because arrangements were made through him and we do not want this to sit for too long.
>
> Please let us know next steps so we can proceed accordingly and have Andy pick up the ivory asap.

JACKSON responded that same day:  "we want to obtain the ivory."  This exchange shows that JACKSON was aware the elephant was killed in a Zimbabwean National Park. HUNTER's expression of "concern" is further evidence the parties involved in the hunt believed it was improper to kill an elephant in Gonarezhou National Park.

31.    FWS-OLE Special Agent Stacy Campbell personally met with the CPI on January 19, 2016.  During the meeting, the CPI described to Special Agent Campbell his encounter, the day before, with KYNE EDWARDS, who represented himself to be HANNO VAN RENSBURG's manager at AUTHENTIC AFRICAN SAFARIS.  When EDWARDS expressed his familiarity with PAUL ROSS JACKSON, the CPI showed EDWARDS the photograph of the dead elephant referenced above in paragraph 26.   The CPI asked if EDWARDS thought JACKSON would be able to get the ivory out of Zimbabwe.  EDWARDS did not deny JACKSON was working to smuggle the elephant.  Instead, he responded "you know Ross" and then smiled, without saying more.  EDWARDS's statement to the CPI is an additional piece of information informing my belief JACKSON intends to smuggle an African elephant ivory trophy into the United States.

32.    On February 5, 2016, at the Safari Club International ("SCI") Convention in Las Vegas, Nevada, Special Agent Meyers, again acting in an undercover capacity, met with PAUL ROSS JACKSON.  Special Agent Meyers explained he was interested in hunting elephants, rhinoceroses, and other African big game animals with JACKSON's professional hunter, VAN RENSBURG.  JACKSON then introduced Meyers to VAN RENSBURG, who had a display at the convention for his company, AUTHENTIC AFRICAN ADVENTURES.  During the resulting conversation Special Agent Meyers discussed with VAN RENSBURG, in JACKSON's presence, the difficulty of smuggling elephant ivory into the United States:[4]

a.    JACKSON commented to Special Agent Meyers that VAN RENSBURG was working on getting his ivory out of Zimbabwe.  JACKSON told Special Agent Meyers that VAN RENSBURG can "make anything happen."

b.    VAN RENSBURG explained to Special Agent Meyers that South Africa and Namibia are the only countries where American hunters can shoot an elephant and successfully bring the trophy back to the United States.

c.    VAN RENSBURG stated Americans cannot import Zimbabwean elephants into the United States

d.    When Special Agent Meyers stated he wanted to hunt in the same place in Zimbabwe where JACKSON had hunted, and that he, too, wanted to kill a large bull elephant, VAN RENSBURG responded that he could not guarantee that Special Agent Meyers would be able to get the ivory back into the United States.  But "anything is possible; you just have to know how."

e.    VAN RENSBURG told Special Agent Meyers that he and others were working to get JACKSON's ivory out of Zimbabwe, but "there are no guarantees."

33.    Special Agent Meyers and VAN RENSBURG also discussed the details of PAUL ROSS JACKSON's ninety-six pound elephant hunt.

a.    VAN RENSBURG stated JACKSON's ninety-six pound elephant was only coming out of Gonarezhou National Park at night and they had hunted the animal at night in an attempt to kill it outside the park.

b.    JACKSON shot the animal on the boundary of the park but only wounded it, which forced them to track the animal for thirteen hours deeper inside the park where the final shot that killed the animal was taken well inside Gonarezhou National Park.

c.    When Special Agent Meyers asked if the Zimbabwe government scout that accompanied them on the hunt was okay with them taking the animal inside the park, VAN RENSBURG stated he had to *"make it okay"* and had to *"justify"* the incursion into the park on *"safety"* grounds.

---

[4] Although Special Agent Meyers wore a recording device, this conversation was inadvertently unrecorded because the recorder's battery was depleted.

d.   The contact was concluded with VAN RENSBURG asking Special Agent Meyers to stop by the booth tomorrow to discuss prices on an elephant and rhino hunt.

34.     On February 6, 2016, Special Agent Meyers acting in the same undercover capacity, returned to HANNO VAN RENSBURG's display booth at the SCI Convention in Las Vegas, Nevada.  Special Agent Meyers made a digital video of his conversation with VAN RENSBURG:

a.   VAN RENSBURG quoted Special Agent Meyers a twelve-day elephant hunt in Zimbabwe for $50,000 U.S. dollars and a South African rhino hunt on his private ranch for an additional $55,000 U.S. dollars.

b.   VAN RENSBURG told Special Agent Meyers that "Ross," meaning PAUL ROSS JACKSON, "has brought a lot of people to my business."  In addition, JACKSON had promised VAN RENSBURG a double rifle.  I know, from my experience, that this is a substantial gift.  Double rifles typically cost at least $5,000 and often considerably more.

c.   VAN RENSBURG confirmed that he hunted with PAUL ROSS JACKSON in 2011, 2012, 2012, 2014 and 2015.  He also confirmed PAUL ROSS JACKSON killed the ninety-six-pound elephant in April 2015 before discussing several other elephant hunts with JACKSON.

d.   When Special Agent Meyers asked about elephant tags issued to hunt inside Gonarezhou National Park, VAN RENSBURG replied *"We shot that thing inside Gonarezhou…that is not allowed."*  Special Agent Meyers responded JACKSON had mentioned on another occasion that permits are issued to hunt elephants inside Gonarezhou and Kruger National Parks.  VAN RENSBURG stated *"No…the boundary is the river…you can't go in the park.  We shot it in the park…we did a lot of things with Ross…go into the park, get the big elephant, come back; it's not supposed to be like that.  It might happen again, but it's not supposed to.  I can't sell that.  Like Ross told you, we made things happen, but I don't sell that."*

e.   When Special Agent Meyers responded with disbelief regarding VAN RENSBURG's ability to get the Zimbabwean game scout to go along with the kill inside the park, VAN RENSBURG stated "money, money talks."

f.   Special Agent Meyers asked if VAN RENSBURG was going to be able to get JACKSON's ivory out of Zimbabwe.  VAN RENSBURG replied *"I can't guarantee it, but we got a plan we're working on . . . export to Africa (South Africa), and then …I can't promise."*  Special Agent Myers then asked, "well, it's stamped 'Zim' isn't it?  VAN RENSBURG said that it was.  Special Agent Meyers, sarcastically said "good luck with that," and asked if the plan had worked before.  "It's worked before," was VAN RENSBURG's reassuring response.

35.     During the February 6, 2016 conversation, Special Agent Meyers specifically asked HANNO VAN RENSBURG to provide details about how he might be able to import PAUL ROSS JACKSON's ninety-six pound trophy.  VAN RENSBURG obliged:

> When I go back, I'm gonna — I need to lie. I need to make a
> declaration. I made it happen, and I don't like to do things like
> that. It's not part of my system. I need to take a letter, and I put a
> …say this is true, this is what we are doing, and I need the guy
> who can sign it, and I send it to Zimbabwe. So I don't, that's why
> I say, I don't like to do things like that, but, it's, I need to get the
> tusks out [inaudible]. There's a loophole.

36.    In that same conversation, HANNO VAN RENSBURG also explained the need to
flee from the site of the kill as quickly as possible, in case there were difficulties with the
relevant Zimbabwean and South African authorities:

  a.    VAN RENSBURG told Special Agent Meyers he and PAUL ROSS JACKSON
left Gonarezhou National Park in Zimbabwe and returned back to VAN RENSBURG's residence
in South Africa as soon as JACKSON had killed the elephant and taken photographs: "The goal
was to get it on the ground. Go back. I didn't even stop at the border. Clear guns-I didn't. Pay
money. Whoom. I had enough."

  b.    Special Agent Meyers asked if JACKSON had wanted to at least wait around to
weigh his ivory. VAN RENSBURG responded "I don't think I gave him a choice . . . to get the
elephant in that park, there was a lot of, you know, need to sort out this guy, need to keep this
guy. There's a lot of things to do, so. If it turns out bad, what happens? If it turns out bad, I
don't want to be there anymore."

37.    Special Agent Meyers and HANNO VAN RENSBURG then discussed the
inherent risks of travelling to hunt in Zimbabwe with the desire to bring back the trophy:

  a.    Special Agent Meyers commented he could not believe PAUL ROSS JACKSON
would travel to Zimbabwe without knowing he could come back with the trophy. VAN
RENSBURG replied: "Yeah, he (JACKSON) knows it. Yeah, I told him no way. No that's
fine, he (JACKSON) just wants to shoot a big elephant."

  b.    VAN RENSBURG continued: "And still, there's no guarantee that things will get
out, you know? It's no guarantee. The way we're going to follow, we might [inaudible]. You
never know in Africa. I can drive in and I gonna, I can bring it back though the border, without
trouble, without trouble. I know. If they caught me, I lose everything I have," VAN
RENSBURG said. "Just taking it out of Zimbabwe?" Special agent Meyers asked. VAN
RENSBURG replied, "Yeah, put it in my vehicle and drive it, put it under my seat. You know,
under something and take it out – it's not that simple."

38.    Special Agent Meyers and HANNO VAN RENSBURG also discussed other
African hunts involving threatened and endangered species:

  a.    VAN RENSBURG said PAUL ROSS JACKSON killed an additional fifty-five
(55) pound elephant in the Hwange National Park area of Zimbabwe. "It's a dream," VAN

RENSBURG said of Jackson's hunting trips: "he will keep on hunting until he gets a 100 pounder."  VAN RENSBURG stated to Special Agent Meyers, "I don't think there's…I don't think there's more than 10 'hundreds' [elephants with hundred-pound tusks] still alive in the world somewhere-I don't think.  In all of Africa-still alive-I don't think there is."

  b. VAN RENSBURG stated "I couldn't believe when he (JACKSON) shot three (3) rhinos and three lions in one week — ten days."

  39. During the conversation, VAN RENSBURG stated JACKSON has an "unbelievable" number of mounted animals in JACKSON's warehouse.[5]

  40. Emails confirm that ivory from the Spring 2015 Elephant Hunt was eventually transferred to ANDY HUNTER.

  a. On June 17, 2015 a man identified in the email as CARL KNIGHT sent an email to HUNTER and JAPIE NEL with the subject:  "Ross Jackson Ivory:"

   Morning Andy,

   The ivory for Mr. Ross Jackson has been released by Parks to Nixon this morning and will be delivered by Nixon to Naison today.

   The ivory weighed 26 and 27 Kgs respectively.

   Regard,

   Carl

  I believe the reference to "Nixon" is a reference to NIXON DZINGAI.  Open source research of the internet shows that DZINGAI operates and advertises African hunting safaris through the business SSG SAFARIS.  During the February 5, 2016 meeting between HANNO VAN RENSBURG, PAUL ROSS JACKSON and Special Agent Meyers, VAN RENSBURG referenced NIXON DZINGAI as an outfitter who had previously led a hunt resulting in the death of a "120 pound elephant" near Gonarezhou.  The next during, on February 6, 2016, VAN RENSBURG again referenced DZINGAI, explaining that he takes clients to DZINGAI's hunting area but that, because of the fees, VAN RENSBURG does not make very much money by taking clients there.  VAN RENSBURG also confirmed that JACKSON shot an elephant in Gonarezhou, which is "not allowed," but that VAN RENSBURG was working to

---

[5] On April 14, 2016, Special Agent Meyers was invited to tour Jackson's warehouse. During that visit, Special Agent Meyers did not see any animal trophies that appeared to be in violation of relevant statutes and regulations.  However, the visit did confirm that PAUL ROSS JACKSON is an avid collector of wildlife trophies.  Furthermore, JACKSON may have other properties where he keeps trophies, away from viewing by others.  For these reasons, the fact that the warehouse did not contain illegal trophies does not alter my determination that there is probable cause to believe that JACKSON is seeking to smuggle in an African elephant trophy from the Spring 2015 Elephant Hunt.

export the ivory to South Africa and then to the United States.  Taken together, I believe that the June 17, 2016 email represents an initial step forward in the smuggling effort described by VAN RENSBURG in February 2016

    b.  The email from CARL KNIGHT was forwarded to ROSELLA QUARTARONE on June 17, 2015 by ANDY HUNTER.  In a subsequent email on June 17, 2016, HUNTER explained the ivory would be delivered to him.  QUARTARONE then used the info@safarispecialtyimporters.com address to "personally thank" HUNTER's "expert handling of this situation for our VIP client" and asked if "Hanno helped at all."  HUNTER did not respond immediately, but later, in an email on June 29, 2015, explained that he had not yet received the ivory.

    c.  On July 22, 2015, HUNTER sent an email to SAFARI SPECIALTY IMPORTERS confirming that the elephant tusks "are in my possession now – Weights – 26kg/ 57 lbs & 27kg/59.5 lbs." TARA MOGHADDAM then sent an email to PAUL ROSS JACKSON to inform him that "Andy received your ivories today.

    d.  The emails show PAUL ROSS JACKSON disputed the ivory in HUNTER's possession was actually the ivory from the elephant that he killed.  To support his claim, JACKSON sent to ROSELLA QUARTARONE pictures of the elephant he killed.  These appear to be many of the same pictures that JACKSON has showed the CPI.  HUNTER disagreed and pointed out that the tusks in the picture have distinctive marks that match marks in JACKSON's photographs. JACKSON continued to disagree but ultimately accepted this conclusion.

    41.    The emails also show that PAUL ROSS JACKSON and others made plans to export the ivory from the Spring 2015 Elephant Hunt from Zimbabwe into South Africa, but that the export was blocked by Zimbabwe due to concerns that such an export would be first step to re-exporting the trophy to the United States.

    a.  WINNIE DA COSTA and PAUL ROSS JACKSON agreed to use SPHERICAL FREIGHT to import the trophy obtained from the Spring 2015 Elephant Hunt into South Africa from Zimbabwe.

    b.  On September 21, 2015 ANDY HUNTER wrote to QUARTARONE, copying CRICHTON, to explain that a Zimbabwean CITES official requested a notarized affidavit "stating that the elephant is not going to be imported into the USA ie to South Africa only."

    c.  In the fall of 2015, emails show that PAUL ROSS JACKSON became delinquent on payments that he owed to ANDY HUNTER and SAFARI SPECIALTY IMPORTERS. Without payment, HUNTER refused to continue making efforts to send the trophy to South Africa.  As part of an effort to soothe HUNTER's anger regarding the lack of payment, ROSELLA QUARTARONE wrote an to HUNTER, PAUL ROSS JACKSON and DANA NICOLE JACKSON on November 13, 2015:

        Dear Andy,

17

I want to take the opportunity to personally thank you with, Mr. Jackson in copy, for the tremendous maneuvering you did to get his ivories out of Zimb Parks.  It took quite some time and if it was not for you, Mr. Jackson would not have his ivories today.  Once he is back and in addition to the payment, I will also send you the required Affidavit stating that the ivories will only be exported to RSA.

Based on my training, experience and the information I have gathered during this investigation, I believe "RSA" stands for "Republic of South Africa."  Furthermore, I believe the reference to "maneuvering" is a reference to the efforts to obtain illegally-hunted elephant ivory from Gonarezhou National Park that were described by HANNO VAN RENSBURG to Special Agent Meyers at the Las Vegas SCI Convention in February 2015.

d.  On January 22, 2016, ANDY HUNTER wrote to SAFARI SPECIALTY IMPORTERS:

Hi Rosella

Out National Parks Authority has just delivered a devastating blow to our industry.

As of yesterday we have been advised that no export permit will be issued to any client sending trophies to a 3rd party country.  Ie if a US client wants to send his trophies to South Africa — they will not allow it.  The client will only be able to send his trophies to his home country.  So right now they have rejected Ross Jacksons application to ship his elephant trophies to South Africa.  I have been completely blindsided by this and have had a long drawn out meeting with the Authority yesterday but with no success in getting this decisions changed.  They say they are under huge pressure from CITES and International Groups and have as such have made this decision from the highest level.

They say they are under huge pressure from CITES and International Groups and as such have made this decision from the highest level.

In this regards, I have been asking for an affidavit from Ross Jackson for a very long time — which I feel if I had received some time ago I would have been able to ship his trophies to SA but now that door has closed.

PAUL ROSS JACKSON was informed, via an e-mail from TARA MOGHADDAM of Zimbabwe's decision on January 29, 2016.

42.  As set forth above, on February 6, 2016 HANNO VAN RENSBURG explained to Special Agent Meyers that in order to get PAUL ROSS JACKSON's trophy into South Africa and then into the United States, VAN RENSBURG would "need to lie" and "take a letter, and . . . put a . . . say this is true, this is what we are doing, and I need the guy who can sign it, and I send it to Zimbabwe."  Emails show the scheme described by VAN RENSBURG was actively

pursued.  Specifically, they show that PAUL ROSS JACKSON, HANNO VAN RENSBURG, ROSELLA QUARTARONE, TARA MOGHADDAM, WINNIE DA COSTA and ANDY HUNTER worked together on a plan to fraudulently circumvent the directive of the Zimbabwe National Parks Authority by submitting an affidavit that would falsely claim that PAUL ROSS JACKSON was a resident of South Africa.

 a. On January 26, 2016, just a few days after ANDY HUNTER's email regarding the decision of the Zimbabwe Parks Authority, HANNO VAN RENSBURG, using the hanno@onnahgrouop.co.za address, wrote to HUNTER asking for a telephone number for "Nixon" with SSG Safaris.  VAN RENSBURG said the matter was "urgent."  I believe that the "Nixon" referred to is NIXON DZINGAI.

 b. On February 2, 2016, after ANDY HUNTER forwarded to SAFARI SPECIALTY IMPORTERS a formal copy of the letter from Zimbabwe's National Parks Authority denying a CITES permit that would have allowed the trophy to be exported from Zimbabwe to South Africa.  On February 3, 2016, HUNTER remarked to TARA MOGHADDAM that the National Parks Authority "are under pressure from CITES and because of some Operators taking advance of Zimbabwe they are forced to do this.??  I would like to hear from Rosella and then we can write a letter of appeal."

 c. After several days of not receiving a reply to the email of January 26, 2016 referenced above, HANNO VAN RENSBURG followed up on February 7, 2016:

> Hallo Andy,
>
> Ross Jackson told me there a problem of the export of elephant tusk to South Africa ,today spoke to Japie Nel and he said he will also try to follow up ,himself didn't know about any problems Ross was hunting in Nixon camp but they send the tusk to you.
>
> Can you please update me about the problem,I did booked Ross Jackson with Japie Nel in SSG camp.Ross is long time client of he hunting the last 5 years with me. [sic]

HUNTER responded that same day, February 7, 2016:

> Hi Hanno,
>
> I have all Ross Jackson trophies from that SSG Safaris hunt in storage.  I applied for a CITES Export permit for his tusks and hides in August 2015 but it was sopped as the Parks Authority asked for an affidavit from Jackson stating he was not attempt to import these trophies into the USA due to the elephant ban from US Fish & Wildlife. To date he never produced the affidavit despite many requests for this by myself.
>
> On 8 January 2016 I was advised by our Parks Authority that with immediate effect no export permit would be issued to any clients wanting

to send trophies to any Country other than the Country stated on the TRAS2 ( Hunting Permit).  This has not only affect Jacksons trophies but a score of others as well

Ross Jacksons address on his TRAS2 Permit shows an address in Colorado USA and we have applied for an Export permit to a South African destination.

I will write an appeal to this Export permit rejection but it may help if we can prove Mr. Jackson has a residence in RSA.

I am being told this is all due to International pressure and from CITES tightening up on trade of certain wildlife species.

For future reference if any client hunting in Zim but wants Taxidermy work done in RSA for example — we need o ensure the TRAS2 reflects the South African address.

**Any help/suggestions and letters of complaint from the client may help me with my appeal.  Perhaps Mr. Jackson should approach John Jackson to assist as he may be able to help.  After all the Parks Authority has been very happy to take his trophy fee and issue him a permit to hunt knowing full well there is an elephant ban in place.**

I believe that the reference to "John Jackson" is a reference to the chairman and President of Conservation Force, an organization that provides legal and lobbying services to hunters.  During the February 6, 2016 conversation between HANNO VAN RENSBURG and Special Agent Meyers, VAN RENSBUG denied Zimbabwe issues permits to hunt elephants inside Gonarezhou National Park.  When Special Agent Meyers expressed disbelief about VAN RENSBURG's ability to get someone in Zimbabwe to agree to the kill inside the park, Van RENSBURG said "money, money talks."  I believe the reference to a "trophy fee" may be a coded reference to this bribe "money."  It may also be a reference to the $5,000 that JACKSON told the CPI he had to pay a Zimbabwean game scout before he could hunt in the park.

d.  On February 10, 2016 ROSELLA QUARTARONE received the above emails and responded to ANDY HUNTER, with copies to HANNO VAN RENSBURG, JAPIE NEL, PAUL ROSS JACKSON, and DANA NICOLE JACKSON that she had just returned from the SCI convention in Las Vegas and that she trusted that HANNO VAN RENSBURG "will be replying soon."  She then said while they were waiting for the "residency paperwork noted above" she was including JACKSON on the email to notify him formally of a request to have three replica tusks made.

e.  On February 22, 2016 HANNO VAN RENSBURG sent an email to ANDY HUNTER, SAFARI SPECIALTY IMPORTERS, DENISE CRICHTON and WINNIE DA COSTA, copying PAUL ROSS JACKSON and DANA NICOLE JACKSON explaining that he was working on obtaining an affidavit showing that JACKSON is a resident of South Africa:  "I arrive at my house yesterday and will start working on this today.  I will go to SOUTH

AFRICAN POLICE station and get a letter to confirm this."  QUARTARONE wrote back everyone to ask for a copy of the letter so that she could relay it to HUNTER who could, in turn, relay it to the Zimbabwean authorities.  JACKSON, replied to VAN RENSBURG on February 24, 2016:  "Thank you Hanno."

     f.  On March 13, 2016 ANDY HUNTER advised PAUL ROSS JACKSON that sport-hunted ivory cannot be sold.  HUNTER also reminded JACKSON that "I was expecting a letter proving that you had a residence in SA to try and appeal to the rejection of your application to ship your trophies to the Taxidermist in SA."  That same day, JACKSON wrote to HANNO VAN RENSBURG:  "Hanno, I need your help here please."  On March 16, JACKSON responded to HUNTER, thanking him for the information regarding sport-hunted ivory and informing HUNTER that "I am sure the letter from Hanno will be forthcoming shortly."

     g.  On April 18, 2016, ANDY HUNTER wrote to SAFARI SPECIALTY IMPORTERS expressing concern that "there is not much progress being made.  His tusks are being made into replicas and we have a full elephant cape, 2 feet, 1 skull and 2 bones in storage from his first hunt — I have not yet received any letter from Hanno so have not been able to make any appeal to our CITES for export of trophies to RSA.  TARA MOGHADDAM responded, copying PAUL ROSS JACKSON and DANA NICOLE JACKSON, in an email stating that SAFARI SPECIALTY IMPORTERS would have to follow up with HANNO VAN RENSBURG but that "our hands are tied until Hanno replies and forwards the letter so you can begin the export process to RSA."

     h.  When SAFARI SPECIALITY IMPORTERS received no updates from HANNO VAN RENSBURG about the letter of residency, TARA MOGHADDAM sent an email on May 4, 2016 to WINNIE DA COSTA explaining that neither SAFARI SPECIALTY IMPORTERS nor JACKSON had received an update from VAN RENSBURG.  "In hopes of speeding up the process, Ross is asking for your assistance with obtaining the notarized RSA residency letter that Andy needs in order to proceed with the export to you.  DACOSTA wrote back:

        Dear Tara,

        I have spoken to my daughter who is an attorney and she has stated that a residency letter would not be possible as this has to be issued by the department of home affairs.

        I can have a letter notarized to say that Ross visits South Africa on a number of occasions each year and stays with my daughter when he is here, if this would help.

        Otherwise, Ross, please advise what you require and I will forward to my daughter, who can then advise.

        Thanks, Winnie.

DA COSTA's remark that "Ross visits South Africa on a number of occasions each year," confirms my belief, informed by JACKSON's travel records and evidence showing that he is the full time owner and operator of businesses in Colorado, that JACKSON is not, in fact, a resident of South Africa. Instead, he visits South Africa several times each year for the purpose of hunting.

43.     On July 8, 2016 Special Agent Meyers consensually recorded a telephone call with HANNO VAN RENSBURG.

a.   VAN RENSBURG said it was "impossible" to get elephant ivory out of Zimbabwe now.

b.   In the past, VAN RENSBURG explained, the authorities always need bribery — it's always — last time I paid $8,000 in 14 days in bribery to make everything happen . . . to pay $8,000 out of my pocket, it's, you know, it's not worth it [inaudible] I get a happy customer, but I take the loss and I don't want to be in that [inaudible]" again. When Meyers asked if the client would reimburse the bribe, VAN RENSBURG responded negatively because the hunts are sold as being all-inclusive. "I didn't even ask Ross for, for that, money, or something like that, it's just, you know, you pay a bribe to get out there, yeah, something you do things to keep customers happy, but, you don't make money on it." Meyers asked questions to clarify if the bribery was for the Spring 2015 Elephant Hunt, VAN RENSBURG replied "$8,000 for bribery.

c.   VAN RENSBURG also discussed, in guarded fashion, a scheme to smuggle PAUL ROSS JACKSON's ivory from the Spring 2015 Elephant Hunt into South Africa from Zimbabwe:

> No, I stop, I stop, we deliver it to the taxidermy [I believe this is a reference to ANDY HUNTER's taxidermy shop in Zimbabwe] and but my part was stopping there, I, you know, we, they [inaudible] but I'm not involved, I told them, "I don't wanna — it wasn't part of my deal — I don't wanna be involved in that and get it out and, you know, I, I, he got a plan how we can do it, but, umm, you know, it's a risky plan — trouble — I don't want to get arrested [inaudible] in my country it's fine, but, to get arrested in Zimbabwe is a different thing.

d.   Meyers again asked if they had specifically managed to get the ivory into South Africa. VAN RENSBURG responded:

> [inaduble] It's at taxidermy in Zimbabwe still, [inaudible] there's a way it will come out, I mean it's a way — but I didn't — there's no expectations, I don't wanna give you expectations that I can get it out.

e.   After being asked about the ivory's current location, VAN RENSBURG again explained how he would have to lie in order to get the ivory out of Zimbabwe:

"No, no, I don't wanna, you know, I got contact with him [the taxidermist, who I believe to be ANDY HUNTER], so I follow the system but, umm, [inaudible] I need to, you know, at the end, I need to do paperwork and things for [inaudible] and lie, you know, make, make, make false, umm, statements to get it out and I don't wanna do that, I don't wanna, I don't wanna put me in that position ever again.

f.   Meyers inquired deeper: "Well, so you're not going to do that for his [JACKSON's] or, or you're gonna do it and not do it ever again?" VAN RENSBURG replied: "Never do it ever again." I believe that this is an admission that VAN RENSBURG did, in fact, make false statements to Zimbabwean authorities, on JACKSON's behalf, for the purpose of exporting the ivory from the Spring 2015 Elephant hunt from Zimbabwe and into South Africa.

44.   On August 22, 2016 PAUL ROSS JACKSON, DANA NICOLE JACKSON and their son, WYMAN JACKSON, came by the CPI's place of business. The CPI attempted to record the conversation but was unsuccessful because of an unknown problem with the recording equipment. During the conversation, JACKSON explained that he had just returned from a hunting trip in Namibia and Zimbabwe. JACKSON told the CPI the elephant from his Spring 2015 Elephant Hunt in Gonarezhou was with HANNO VAN RENSBURG. He also claimed the ivory from that hunt was with WINNIE DA COSTA at KWIKTAN TAXIDERMY in Johannesburg, South Africa. JACKSON provided the CPI with many photos of his hunt and with following photograph of himself, posing with what he claimed was the ivory from the Spring 2015 Elephant Hunt, in South Africa:



45. During the weeks between July 8 and August 26, 2016 the CPI provided additional information regarding the CPI's knowledge of PAUL ROSS JACKSON's future hunts:

a. The CPI reported that JACKSON was planning on heading to Namibia to shoot a rhino and then to Zimbabwe to hunt elephants from July 18 – August 18, 2016.

b. On July 28, 2016, the CPI provided text messages containing pictures of two dead elephants that had been taken in Zimbabwe by JACKSON's son WYMAN JACKSON and his wife NICOLE JACKSON.

c. On August 22, 2016, the CPI also provided pictures provided to the CPI by JACKSON. The photographs were from JACKSON's safari to Namibia and Zimbabwe. Among the many photographs, a few depicted JACKSON with three separate elephants all of which he took in Zimbabwe.

d. On August 25, 2016, the CPI recorded a conversation with JACKSON regarding his elephant hunting. During that conversation, JACKSON changed his story and told the CPI that the picture of him with the tusks was actually the fifty pound elephant he shot, not the ninety-six pound elephant from SSG Safari's in Gonarezhou National Park. Jackson claimed that the elephant ivory obtained from SSG Safari hunt was still in Zimbabwe.

46. On August 30, 2016 ANDY HUNTER wrote an email to SAFARI SPECIALITY IMPORTERS and DENISE CRICHTON with the subject line "Re Ross Jackson – Good News!":

Good Day Rosella

My constant pressure has paid off – have finally on with Ross Jacksons first export permit for his elephant hunt. The draft copy was issued today and I will process the same this afternoon.

I will send Denise a copy of the Permit once I have sorted it out.

47. On August 31, 2016 ANDY HUNTER followed up with an email to DENISE CRICHTON, WINNIE DA COSTA and SAFARI SPECIALITY IMPORTERS. The email stated in pertinent part that they could "find attached CITES Export Permit for Ross Jackson first hunt in Zimbabwe with SSG Safaris." Agents were, however, unable to find an attachment to this email.

48. When agents were unable to find the attached CITES permit, a request as sent to an FWS-OLE special agent in Botswana who is serving as a foreign attache at the United States embassy. That agent was able to obtain from Zimbabwean officials a copy of the hunting application and CITES permit for the elephant killed by PAUL ROSS JACKSON in April 2015.

a.   The hunting application identifies "PAUL ROSS JACKSON" as the client and lists his U.S. passport number and Evergreen, Colorado address.  It further lists "SSG Safaris t/a Go Luck" as the operator with whom JACKSON hunted.  ANDY HUNTER with CHIPTANI SAFARIS is listed as the shipping agent.  The permit lists the "daily rate" of the hunt as $4,500 and the "trophy fee" for successful hunting of the elephant as $10,000.  In a section labeled "Details of Species Hunted" the hunting application lists "ELEPHANT – WITH TUSKS" as the "Species."  It then states that the elephant was "killed" in "Malipati Communal," which is a hunting concession in Zimbabwe that borders Gonarezhou National Park.  Based on the information set forth above, as well as additional information gathered during the investigation and set forth below, I believe that this is false:  the elephant was not killed in Malapati and was, instead, killed in Gonarezhou National park.

b.   The CITES permit issued by Zimbabwe is dated August 26, 2016.  It lists "PAUL ROSS JACKSON" as the importer, but does not describe him as having a South African residence.  Instead, the permit is issued "c/o Windows for Africa," that is "care of" Windows for Africa, which I believe to be a reference to WINNIE DA COSTA's taxidermy studio.  The listed address to which the elephant is to be imported is Postnet Suite 1016, PVT Ba X1 Four Ways North 2086 in South Africa.  The exporter is listed as "SSG Safaris, P O Box 473, Chiredzi, Zimbabwe. The CITES permit describes the package to be exported from Zimbabwe and imported into South Africa as one comprising the 4 bones, 4 feet, 3 panels, 1 skin, 1 skull, and 2 tusks of an African Elephant.  The two tusks are respectively marked ZW2015 26037-26 and SW2015 26038-27:

49.   Subsequent emails confirm that the two tusks marked ZW2015 26037-26 and ZW2015 201638-27 belong to the elephant that was killed in April 2015.  On October 12, 2016, ANDY HUNTER sent an email to SAFARI SPECIALITY IMPORTERS listing PAUL ROSS JACKSON's trophies:

> Hi Rosella
>
> Herewith list as requested :
>
> SERENGETI/SSG HUNT :
>
> ELEPHANT – 2 X TUSKS (ZW 2015 26037/38 – 26KG/27KG)
>
> ELEPHANT – 1 X SKULL, 1X Cape, 3 X PANELS TANNED SKIN, 4 X FEET, 4 X LEG BONES
>
> *Two sets of Replica tusks (from TCI).*

This description corresponds with the CITES permit issued on August 26, 2016.  Based on this email, I also believe that PAUL ROSS JACKSON ordered and obtained two replica tusks, cast from the original ivory tusks of the dead elephant.

50.    On December 12, 2016, FWS-OLE Special Agent Stacy Campbell met with TARA MOGHADDAM.  MOGHADDAM voluntarily agreed to provide a statement, which is set forth below in sum and substance and in pertinent part:

a.    MOGHADDAM confirmed both her and ROSELLA QUARTARONE used the email account info@safarispecialtyimporters.com.  QUARTARONE also had her own email account, rosella@safarispecialtyimporters.com.  QUARTARONE would use email and What'sApp (an encrypted application to message between individuals) on her phone to communicate with clients.  Most of QUARTARONE's conversations with JACKSON were through What'sApp.

b.    MOGHADDAM told Special Agent Campbell that JACKSON killed a big elephant in a National Park in Zimbabwe.

c.    MOGHADDAM confirmed JACKSON used the taxidermist WINNIE DA COSTA in South Africa and confirmed that DA COSTA operates KWIKTAN and WINDOWS OF AFRICA.

d.    MOGHADDAM said that ANDY HUNTER had problems in Zimbabwe getting permits to authorize elephants from Zimbabwe to South Africa because JACKSON was not a resident of South Africa.  SSI, JACKSON, and DA COSTA were working on obtaining a letter of residency for JACKSON stating he was a South African resident in order to export the ivory to South Africa from Zimbabwe.  MOGHODDAM she had hear ROSELLA QUARTERONE having conversations which would lead her to believe DA COSTA got a letter and sent it to HUNTER so he could proceed with the permitting process.

51.    Special Agent Meyers again attended the SCI Convention in Las Vegas between January 31, 2017 and February 3, 2017 in an undercover capacity.  On February 1, 2017 Special Agent Meyers went to HANNO VAN RENSBURG's display booth and made a digital video recording of his conversation, which is set forth below in sum and substance and in pertinent part.

a.    During the conversation, VAN RENSBURG discussed corruption in Zimbabwe.  According to VAN RENSBURG, Meyers would need an additional $9,000 is need to "make things straight" on any hunt in Zimbabwe.

b.    For the first time, VAN RENSBURG explained that PAUL ROSS JACKSON actually shot three different elephant during the hunt in April 2015.  The first was shot at night, injured, and ran away.  While obtaining to gain permission to go onto the National Park and while camping they shot and killed a second elephant which charged into their camp area.  The second elephant was significantly smaller than the first so they found a third elephant track.  PH's tracked this elephant until they located it and JACKSON took this elephant within the National Park.  The third elephant is the elephant whose ivory was stamped by the Zimbabwe authorities. VAN RENSBURG said he was charged more money for the hunt because they had killed a second elephant.  VAN RENSBURG also told Special Agent Meyers to use his South

African address on hunting return forms so they could export the ivory out of Zimbabwe, and he had learned that lesson because of JACKSON listing his United States address.

52.     I personally interviewed HANNO VAN RENSBURG at the SCI Convention on February 2, 2017.  In sum and substance and in pertinent part, VAN RENSBURG told me that PAUL ROSS JACKSON shot an elephant outside Gonarezhou National Park, in the Malapati area of Zimbabwe.  According to VAN RENSBURG, the hunting party then proceeded inside the National Park where they attempted to track the elephant.  While tracking they stopped to sleep and where awoken by a charging elephant.  They shot that elephant, continued tracking and shot an elephant about fifteen miles into the park.  VAN RENSBURG confirmed there were issues on the movement of the ivory due to JACKSON listing a United States address on his hunting return.  Although VAN RENSBURG admitted to these activities, he did not admit that the elephant was killed illegally.  Several times during the interview, VAN RENSBURG agreed to write an affidavit describing his hunt with JACKSON and asked to write the interview the next morning.  VAN RENSBURG became very emotional during the interview and, at that point, the interview was concluded.

53.     I also interviewed ANDY HUNTER at the SCI Convention on February 2, 2017.  In sum and substance and in pertinent part, HUNTER told me he had two safaris' worth of trophies in his possession from JACKSON, which included one elephant from his SSG safari hunt.  HUNTER confirmed the elephant was shot in a national park.  HUNTER claimed that it was legal to kill an elephant in the national park if it was wounded outside the park, but admitted that he did not make inquiries into the precise manner in which the elephant was killed.  HUNTER also confirmed that JACKSON's Colorado residence being listed on the hunting permit had caused Zimbabwe's National Parks Authority to deny the original export permits.  HUNTER said he provided the Zimbabwe National Parks Authority with a letter of appeal asking it to reconsider the denial of JACKSON's export permit in light of his frequent hunts in Zimbabwe and the larger effects of such a denial on the hunting industry as a whole.  HUNTER said the Zimbabwe authority later approved his appeal and he had JACKSON's ivory ready to ship to South Africa.

54.     During the interview on February 2, 2017, ANDY HUNTER agreed to meet with ROSELLA and ROBERT QUARTARONE to talk about PAUL ROSS JACKSON's elephant hunt.  HUNTER voluntarily agreed to record the conversation.  During the conversation, ROSELLA QUARTARONE told HUNTER, in sum and substance and in pertinent part, that she stopped her business relationship with JACKSON due to not paying for services rendered.  She also told HUNTER if JACKSON had listened to her he would have his ivory in the United States, but instead it was stuck back in the South African continent.

55.     On February 6, 2017, I interviewed JOANNA COIL, an employee of PAUL ROSS JACKSON.  COIL told me, in sum and substance and in pertinent part, that after the SCI Convention, JACKSON held a staff meeting in which he told his staff that he had been notified by HANNO VAN RENSBURG that he was being investigated by the Fish and Wildlife Service. JACKSON denied wrongdoing and stated that he intended to bring his ivory into the United States only when the United States lifts its ban on ivory imports.

56.     On May 11, 2017, an FWS-OLE special agent interviewed HANNO VAN RENSBURG at his home in South Africa.  In sum and substance and in pertinent part, VAN RENSBURG further denied any illegal activity.  During the interview, VAN RENSBURG further denied that the elephant killed in April 2015 had been taken illegally.  However, this time, VAN RENSBURG claimed that the elephant had snuck up on their camp in the middle of the night, that it was shot by JACKSON and VAN RENSBURG outside Gonarezhou National Park, and that the hunting party was able to track and kill that particular wounded elephant inside the park after receiving the appropriate approvals.

57.     Also on May 11, 2017, an FWS-OLE special agent interviewed WINNIE DA COSTA at her home in South Africa.  In sum and substance and in pertinent part, DA COSTA explained that she had a notebook filled with all of the paperwork for PAUL ROSS JACKSON's trophies.  She denied having any knowledge that any of the many animals he has killed were taken illegally.  During the interview, she also clarified she was in possession of elephant tusks from JACKSON's hunt in 2014 and that those tusks were at her daughter's house.  Based on this information, as well as other information set forth above, I now believe that the elephant tusks in the picture beneath paragraph 44 of this affidavit do not belong to the elephant shown in the picture beneath paragraph 27.

58.     Based on my training and experience, and in light of the information set forth above, I believe that there is probable cause to believe that PAUL ROSS JACKSON, DANA NICOLE JACKSON, HANNO VAN RENSBURG WINNIE DA COSTA, DENISE CRICHTON, ANDY HUNTER, and ROBERT and ROSELLA QUARTARONE, together with others, are involved in an ongoing smuggling scheme.  Specifically, there is probable cause to believe that (1) these individuals actively worked together to attempt to export one of the trophies which was shot in a National Park with bribe money from the Spring 2015 Elephant Hunt into South Africa and (2) ) that these individuals intend to re-export that trophy into the United States or attempt to sell the ivory in violation of the African Elephant Act and/or the End Wildlife Trafficking Act.

### THERE IS PROBABLE CAUSE TO BELIEVE THAT A SEARCH OF THE SUBJECT ACCOUNTS WILL LEAD TO EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF FEDERAL CRIMES

59.     The previous warrant for the SUBJECT ACCOUNTS, returned on October 31, 2016, contained emails sent from those accounts up to October 13, 2016.  On February 15, 2017, an order was issued pursuant to 18 U.S.C. § 2703(d) for updated records relating to the dates, times, sources and destinations of communications to and from the SUBJECT ACCOUNT.  The Provider responded with that information on February 15, 2017..  My review of that information shows that between October 13, 2016 and February 15, 2017, there were approximately 22 emails between the rjackson@ttninv.com account and Winnie@windowofafrica.co.za, which I believe is an email account used by WINNIE DA COSTA.  Between October 13, 2016 and February 15, 2017, the rjackson@zjjinv.com account sent one email to Winnie@windowofafrica.co.za, one email to chiptanai@zol.co.zw, four emails to Hanno@onnahgroup.co.za, and three emails to info@safarispecialityimporters.com.  I served a formal preservation request under 18 U.S.C. § 2703(f) to Estreet on April 4, 2017.

60.     I believe that there is high likelihood that evidence, fruits and instrumentalities of crimes involving wildlife trafficking, including violations of the Lacey Act (16 U.S.C § 3771), the Endangered Species Act, (16 U.S.C. § 1538), the Elephant Conservation Act,( 16 U.S.S. § 4223), conspiracy (18 U.S.C. § 371) and, smuggling (18 U.S.C. §545) will be found in the SUBJECT ACCOUNTS.  This belief is based on the information set forth above in paragraphs 22-57 indicating (1) that PAUL ROSS JACKSON  is a user of the SUBJECT ACCOUNT; (2) that ROSELLA QUARTARONE is part of a conspiracy involving PAUL ROSS JACKSON and others the purpose of which is to make false statements to relevant authorities regarding the source, nature, and number of elephant ivory obtained during the Spring 2015 Elephant Hunt, for the purpose of exporting or smuggling the ivories from Zimbabwe to South Africa and from South Africa to the United States; (3) my experience indicating that emails and copies of emails are maintained by users for extended periods of time; (4) my experience that, even if emails have been deleted since PAUL ROSS JACKSON became aware of the investigation, those emails may remain on Google's servers, and (5) my experience that evidence showing that certain emails were deleted can, by itself, constitute evidence of criminal knowledge and intent.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

61.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the Provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of ATTACHMENT B.  Upon receipt of the information described in Section I of ATTACHMENT B, government-authorized persons will review that information to locate the items described in Section II of ATTACHMENT B.

62.     I know, from my training and experience, that the complete contents of the SUBJECT ACCOUNTS may be important for establishing the actual user who has dominion and control of the SUBJECT ACOUNTS at a given time.  Email accounts may be registered in false names from anyone in the world with little to no verification by providers.  They may also be used by multiple people.  Therefore, the content of a given account, and information the Provider collects about that account often provides important evidence regarding the actual user's dominion and control of the SUBJECT ACCOUNTS.

63.     I know, from training and experience that criminals discussing their criminal activity may use slang, short forms, or code words (which require entire strings or series of messages to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an email or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters.  Keyword searches would not account for any of these possibilities, so actual review of the contents of a Google account by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence within the account

64.     I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in ATTACHMENT B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review records produced by a Service Provider and keep only such records as the Government finds to be related to the offenses described herein and in ATTACHMENT B during a single analysis. Your Affiant has learned through practical experience that various emails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between email threads, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity within email accounts pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the activity in the account at different times is necessary to understand the full value of the information contained therein. In order to obtain the full picture and meaning of the data from the information sought in ATTACHMENTS A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the emails and data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data provided by the Service Providers, and to review the communications in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will obtain the mirrored images in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

65.     This application seeks a warrant to search all responsive records and information under the control of EStreet Communications a provider subject to the jurisdiction of this court, regardless of where EStreet Communications has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within EStreet Communications possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

**REQUEST FOR NON-DISCLOSURE, TO RESTRICT CASE AND TO KEEP SUBJECT ACCOUNTS ACTIVE**

66.     Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I respectfully request the Court order the Provider not to notify any other person, including the holder of the SUBJECT ACCOUNTS identified in ATTACHMENT A, of the existence of this warrant.  This request is

made because notification of the existence of the warrant may result in flight from prosecution, and/or witness and evidence tampering. Specifically, in this case the subjects of the investigation are frequent international travelers with extensive international contacts who, if alerted, would have the means and abilities to evade the jurisdiction of United States law enforcement. In addition, alerting the subjects of this investigation might cause them to delete information on telephones or information in email accounts and on computers that are not yet known to law enforcement. It might also cause the subjects to ship illegally hunted trophies and other evidence to jurisdictions outside the reach of United States law enforcement or to destroy that evidence.

      67.    Because the investigation is ongoing, I would further request the Court to order the Provider to continue to maintain the accounts further detailed in ATTACHMENT A, in an open and active status.

      68.    I respectfully request that this affidavit and the Court's Order be **RESTRICTED** at level 3 until further order of this Court.

      69.    EStreet Communications is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2). This warrant application is sought pursuant to 18 U.S.C. § 2703, and seeks to require EStreet Communications to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." Id

      70.    The restriction is necessary because this affidavit reveals an ongoing investigation. For the same reasons described in paragraph above, restriction will avoid premature disclosure of the investigation, guard against the flight of investigative subjects, and efforts to tamper with or destroy evidence, except that copies of the affidavit in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the FWS-OLE, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

## CONCLUSION

      71.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

      72.    Based on the foregoing, I respectfully that there is probable cause to believe that evidence or contraband, fruits or instrumentalities of crimes involving wildlife trafficking, including violations of the Lacey Act (16 U.S.C § 3771), the Endangered Species Act, (16 U.S.C. § 1538), the Elephant Conservation Act,( 16 U.S.S. § 4223), conspiracy (18 U.S.C. §

371) and, smuggling (18 U.S.C. §545) may be located within the SUBJECT ACCOUNTS described in ATTACHMENT A.

73.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

74.     Therefore, I respectfully request that the attached warrant be issued authorized the search and seizure of the items listed in ATTACHMENT B.


_s/ Anne-Marie Sharkey_
Anne-Marie Sharkey, Special Agent
FWS-OLE


Submitted, attested to, and acknowledged by reliable electronic means on May 16, 2017.


HON. NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Bryan David Fields, Assistant United States Attorney.